## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Beth Ann Hickey, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-4120 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| Board of Education of the City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |

### Plaintiff's Response To Defendant's Statement Of Undisputed Material Facts
### And Additional Facts Pursuant To Local Rule 56.1(b)

Plaintiff, Beth Ann Hickey, through her attorneys, Anthony J. Peraica and Jennifer M. Hill of Anthony J. Peraica & Associates, Ltd., and pursuant to Local Rule 56.1(b), responds to Defendant's Statement of Material Facts and provides additional facts as follows:

**A.    The Parties, Jurisdiction and Venue.**

1.    Plaintiff Beth Ann Hickey ("Plaintiff") is a 61-year-old Caucasian American citizen. Ex. A, p. 211:1-2.

**RESPONSE:** Admit with the exception that Beth Hickey will be 62, a day after this response is filed. Ex. A, p. 21.

2.    The Board oversees and operates a system of public schools in the City of Chicago (Chicago Public Schools, "CPS"). ECF No. 12, Answer, ¶ 4.

**RESPONSE:** Admit.

3.    Plaintiff's current lawsuit against the Board alleges the Board laid her off on August 26, 2017, and did not hire her because of: (1) her age pursuant to the Age Discrimination in Employment Act (ADEA), as amended, pursuant to 29 U.S.C. § 621 *et seq.*; and (2) her race (Caucasian) pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000 *et seq.* ECF No. 10, Count I, Count II. The Court has subject matter jurisdiction over Plaintiff's federal

claims pursuant to 28 U.S.C. §1331, except that Plaintiff's claims based on conduct prior to May 8, 2017 are time-barred because it occurred more than 300 days prior to March 4, 2018, the date Plaintiff filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 10-1, p. 1 of 2.

**RESPONSE:** Admit that Plaintiff's complaint asserts claims under ADEA and Title VII reverse-age discrimination and that the subject matter jurisdiction is pursuant to 28 U.S.C. §1331. Plaintiff disputes the remainder of statement 3 as legal conclusions, argument, and not a "short concise statement" in violation of Local Rule 56.1 and furthermore unsupported by citation.

4. Venue is proper in this judicial district and division because Plaintiff's claims stemming from her layoff from the Board and subsequent candidacy for re-employment occurred here.

**RESPONSE:** Admit based on Docket No. 10, ¶7, however, statement 4 violates Local Rule 56.1 in that it is not supported by citation.

**B.    The Positions at Issue**

5. Plaintiff was laid off from her position as a School Clerk Assistant at Thomas Kelly High School ("Kelly") effective August 22, 2017. Ex. A, p. 78:15-18, p. 79:12-13, Dep. Ex. 11, Layoff Letter, attached here as Exhibit L.

**RESPONSE:** Admit.

6. Thereafter, Plaintiff was not hired for the following positions: School Library Assistant at Curie Metropolitan High School ("Curie"); Special Education Classroom Assistant ("SECA") at Adlai E. Stevenson ("Stevenson"); School Guidance Counselor ("SGCA") at Kelly; School Clerk Assistant at James Shields Middle School ("Shields"); and School Clerk Assistant at John F. Kennedy High School ("Kennedy"). Ex. A, p. 90:21-24, p. 123:4-8, pp. 175:4-176:9, p. 224:2-5; Ex. F, ¶¶ 4, 13-14.

**RESPONSE:** Admit.

*a. Kelly – Plaintiff's August 22, 2017 layoff.*

7.      Raul Magdaleno, who is over 40, became the principal of Kelly in 2017. Exhibit B, Deposition of Principal Raul Magdaleno, pp. 21:24-22:2, p. 29:4-6. During his first year as principal at Kelly, due to declining student enrollment, Principal Magdaleno was required to cut more than $2 million to balance Kelly's budget for the school year 2017-2018. Ex. B, p. 39:7-16, p. 41:12-22, p. 95:4-7; Ex. A, p. 56:5-7, p. 58:4-13, 63:8-10, Dep. Ex. 9, Kelly Budget, attached as Exhibit M (BOE 000222-000223). School administrators, including Principal Magdaleno, receive yearly anti-discriminations training. Ex. B, p. 106:19-24.

**RESPONSE:** Plaintiff disputes statement 7 as it contains legal conclusions, argument, and not a "short concise statement" in violation of Local Rule 56.1. Plaintiff admits the facts contained in statement 7 with the exception that Raul is 44 years old, having been born in 1976. Ex. B, p. 29:4-6.

8.      The central focus of Principal Magdaleno's process for balancing the "really huge deficit" of more than $2 million was to minimize its impact on Kelly's students and student learning. Ex. B, pp. 39:7-41:11, Ex. M. He "want[ed] to keep as many cuts away from the students as possible and away from anything that might impact their academic environment or education." Ex. B, p. 39:19-23.

**RESPONSE:** Plaintiff disputes statement 8 as argumentative. Plaintiff disputes that Principal Magdaleno was "student-focused" because he testified to "literally cutting almost everything from supplies. We eliminated busing. We eliminated professional development. . . . And unfortunately once we got rid of all the material things, we were looking now at eliminating positions within the school." Exhibit B, p. 39:23-40:6. He began with office personnel, then counseling, and teaching. Exhibit B, p. 41:1-5.  He did not eliminate any of the 4 Assistant Principals that he hired in the summer months of 2017. Exhibit B, 23:21-24:14.

9.      He eliminated everything he could before turning to personnel – supplies, busing, and professional development. Ex. B, pp. 39:7-41:11. Once he "got rid of all the material things," balancing the budget required eliminating personnel. Ex. B, p. 40:4-6, pp. 39:7-41:11.

**RESPONSE:** Admit.

10.     To determine which positions would be eliminated, Principal Magdaleno "keep[s] the students at the center of our decision-making process." Ex. B, pp. 39:7-41:11. He first cuts positions with the least impact on students — office personnel. Ex. B, pp. 39:7-41:11.

**RESPONSE:** Plaintiff disputes statement 10 as argumentative. Plaintiff disputes that Magdaleno cut positions with the least impact on students, while retaining all four of the Assistant Principals that he hired in the summer months of 2017. Exhibit B, 23:21-24:14.

11.     Because teachers have the most impact on students and student learning, teacher positions are cut last. Ex. B, pp. 39:7-41:11. When teaching positions must be cut, Principal Magdaleno tries to keep core classes intact since those are most important to students, so he selects non-core class teachers before core class teachers for elimination.  Ex. B, p. 41: 4-11.

**RESPONSE:** Plaintiff disputes that teacher positions are cut last as Magdaleno cut only some and not all office positions and counseling positions before he cut non-core teaching. See ¶12 below. Plaintiff further disputes that teacher positions are cut last because Magdaleno cut non-core teaching positions in 2017 but did not cut any Administrative Management/Supervisory Positions. Ex. B, p. 23:21-24:14; p. 39:7-41:11.

12.     In 2017, to balance the over $2 million budget shortfall, Principal Magdaleno identified thirty-one positions for layoffs. Ex. B, pp. 39:7-41:11, p. 42:20-23 (31 positions). The 2017 layoffs included office personnel such as one School Clerk Assistant and one School Clerk (Ex. B, pp. 91:7-92:5, Ex. A, p. 51:5-16) as well as teachers in non-core teaching positions (Ex. B, pp. 39:7-41:11, p. 41:20-23).

**RESPONSE:** Admit.

13.     The applicable collective bargaining agreement ("CBA") between the Board and [union] sets forth obligatory procedures for layoffs which cannot be veered from because the Board is bound by the CBA. Ex. B, pp. 99:22-100:11, Dep. Exhibit 5, CBA, attached as Exhibit N, at p. 1. As a School Clerk Assistant in 2017, the applicable CBA layoff procedures in effect when Plaintiff was laid off from Kelly were set forth in Article 9 Section 10, which states:

> **9-10. Layoff and Recall.** The BOARD's ESP Layoff and Recall Policy will be applied to include criteria for determining bargaining unit employees to be laid off. Except when bargaining unit employees are laid off due to school actions, employees shall be laid off by school unit in the following manner:
> The school principal or unit head shall determine the number of positions and which classification(s) within the unit shall be affected. Employees within those clas[]sifications will be laid off in the following order:
>
> 1. Employees who do not possess the highly qualified status or who do not hold necessary certifications or other qualifications;
>
> 2. Employees rated unsatisfactory (i.e., below 1.9 points on current system) in their most recent performance rating.
>
> 3. Employees rated developing (i.e., 2.0-2.6 points on the current evaluation system) in their most recent performance rating.
>
> 4. All other employees by seniority.
>
> For purposes of this policy only, "seniority" with regard to layoff and reappointment shall mean the length of full-time accumulated service in any career service/ESP position, with such seniority accruing from the date of initial appointment to a career service/ESP position with the Board. This definition of "seniority" shall apply only to those ESP employees who are represented by a bargaining unit at the time of their layoff."

Ex. B, pp. 99:22-100:11, Ex. N, CBA, p. 1, p. 48-49, p. 369 (BOE 000525, 000570, 000572-573, 000893); Ex. A, p. 59:6-22, pp. 61:6-63:6, p. 83:11-24; Ex. B, p. 45:4-24, pp. 84:20-85:2; Exhibit D, Deposition of Principal O'Toole, p. 98:5-18.

**RESPONSE:** Plaintiff admits that the CBA sets forth the above 9-10 Layoff and Recall section. Plaintiff disputes that the CBA is the only governing policy on layoffs. Exhibit 1: The Chicago Public

Schools Policy Manual, Section 505.6, is titled: Layoff, Interim Assignment and Reappointment of Educational Support Personnel Employees. Plaintiff disputes statement 13 as argumentative and not a "short concise statement" in violation of Local Rule 56.1.

14.     Thus, under the applicable CBA in effect during the 2017 layoffs, school principals determine the number of positions and position titles that will be affected. Ex. N, Article 9, Section 10. Then, the Board's human resources department (a.k.a. "Talent") determines which specific employee within those position titles will be impacted. Principals do not decide which specific employee will be laid off.  Ex. B, pp. 45:4-24, p. 46:1-8, pp. 99:22-100:11; Ex. N, Article 9, Section 10; Ex. A, p. 83:11-24.

**RESPONSE:** Plaintiff disputes statement 14 as it contains legal conclusions, argument, and not a "short concise statement" in violation of Local Rule 56.1. The CPS Board of Education is involved in any layoffs. Ex. C, p. 20:22-21:5. Plaintiff admits that under the CBA the school principal determines the number of positions and titles that are affected by a layoff and that the "Talent" office lists the employee with least seniority.

15.     Consequently, Principal Magdaleno knew a School Clerk Assistant would be laid off, but, he did not know it would be Plaintiff specifically. Ex. B, pp. 89:14-90:1.

**RESPONSE:** Plaintiff disputes that Magdaleno did not know Plaintiff was going to be laid off. Magdaleno was at Kelly High School from 2003 to 2016 [Ex. B, p. 19:13-21, p. 21:15-17] before returning in 2017 as Principal [Ex. B, p. 21:24-22:2] and Paulette Khateeb, the other school clerk assistant, was there when he came [Ex. B, p. 71:23-72:8]. See also, Exhibit O.

16.     In 2017, the only two School Clerk Assistants at Kelly were Plaintiff and Paulette Khateeb, a 55 year-old female from the United States. Ex. A, p. 52:17-18, 54:14-20, Dep. Ex. 8, PeopleSoft Data, attached as Exhibit O, (BOE 001346); Ex. B., pp. 71:23-11.

**RESPONSE:** Admit.

17.     Seniority was the deciding factor on which School Clerk Assistant would be laid off. Ex. A, pp. 85:22-86:10; Ex. B, Dep. Ex. 2, Kelly Seniority Analysis, attached here as Exhibit P.

**RESPONSE:** Admit.

18.     Khateeb had more seniority than Plaintiff and Plaintiff was, therefore, laid off. Ex. A, p. 51:5-16, p. 52:11-16, pp. 85:22-86:10; Ex. B, p. 72:20-24, pp. 89:3-90:20, p. 90:4-14, pp. 91:7-92:5. Plaintiff concedes she had less seniority than Khateeb and admits once a School Clerk Assistant position selected for elimination, the CBA required her to be laid off. Ex. A, p. 83:14-19, p. 86:5-7. Since her layoff, the eliminated School Clerk Assistant position has not been reopened. Ex. B, p. 44:10-16, p. 93:13-24.

**RESPONSE:** Admit the facts involving seniority. Plaintiff disputes that a School Clerk Assistant position has not been reopened. The Kelly budget for SY2018-2019 allowed for two School Clerk Assistants. Exhibit 2: Kelly High School Budget All Job Summary.

19.     Of the two School Clerks at Kelly in 2017, Karen McDonough, who is Caucasian and over 45, was retained, and Merta Roldan, who is Hispanic, was laid-off. Ex. A, pp. 55:5-56:4; *see also* McDonough PeopleSoft Data, attached here as Exhibit Q (BOE 001349-50). Merta Roldan was selected to be laid off because she had less seniority than Karen McDonough. Ex. A, pp. 55:5-56:2.

**RESPONSE:** Admit.

20.     Following Plaintiff's layoff, Principal Magdaleno sent her resume to three schools and recommended her to two principals stating, "Ladies, I am forwarding a resume of an awesome clerk that I lost, she is not bilingual, but wanted to share her resume, I will vouch for her and her awesomeness." Ex. B, p. 97:10-13, Dep. Ex. 4, at BOE 001043-001044, Principal Magdaleono Email, attached here as Exhibit R; Ex. A, pp. 87:12-88:16. The resume he forwarded was the one Plaintiff sent him. Ex. A, pp. 89:16-90:2, Dep. Ex. 15, Email from Plaintiff forwarding her resume, attached here as Exhibit Y (BOE 001087-1088).

**RESPONSE:** Admit.

21.     Principal Magdaleno had worked with Plaintiff before and always considered her to be a "really good employee here at Kelly." Ex. B, p. 97:14-19. He emailed her resume with the hope that his colleagues would call her back. Ex. B, p. 97:8-19, p. 114:19-22; Ex. R. Principal Magdaleno has never sent an email vouching for any other employee's awesomeness. Ex. B, p. 97:20-21.

**RESPONSE:** Plaintiff disputes the Magdaleno's interactions with the Plaintiff. Magdaleno did not work closely with Ms. Hickey. Ex. B, p. 35:24-36:8. He did not supervise her. Ex. B, p. 37:21-24. "[M]y interactions with her were almost non-existent when I became principal." Ex. B, p. 37:5-10. Plaintiff otherwise admits.

*b. Curie – School Library Assistant.*

22.     Plaintiff applied for and was interviewed for School Library Assistant at Curie through Requisition No. 170004LG which was associated with Oracle position No. 148592. Ex. A, p. 109:6-18; Exhibit C, Deposition of Principal Alison Tingwall, Dep. Ex. 1, at BOE 000478-000481, Curie Requisition, attached here as Exhibit S.

**RESPONSE:** Admit.

23.     Alison Tingwall, a Caucasian U.S. citizen who speaks English, Spanish, and some conversational Arabic, was the principal at Curie when Plaintiff interviewed for the School Library Assistant position and had authority over hiring decisions for Curie. Ex. C, p. 11:2-5, p. 62:21-24, pp. 69:24-70:2.

**RESPONSE:** Admit; however, authority over hiring is disputed. "Ultimately, the Board of Ed makes that determination whether or not they're qualified to extend an offer to them. The Board of Ed determines qualification. And when we extend an offer to a teacher, we tell them this offer is contingent upon the Board of Ed finding you qualified for the position." Ex. D, 57: 4-9.

24.     Completion of an associate's degree or higher from a college or university accredited by the North Central Association or another regional accrediting body was a minimum qualification for the School Library Assistant position Plaintiff interviewed for at Curie. Ex. C, p. 72:13-23; Ex. S.

**RESPONSE:** Admit.

25.     Plaintiff's highest level of education is a high school diploma. Ex. A, p. 23:7-21; Ex. R, p. 2. Because Plaintiff did not have an associate's degree or higher, she did not meet the minimum qualifications for the School Library Assistant position at Curie for which she interviewed. Ex. C, pp. 93:11-94:6; Ex. A, p. 23:7-21; Ex. R, p. 2.

**RESPONSE:** Plaintiff disputes because she has a paraprofessional license, ELS(PARA), through the Illinois State Board of Education. Exhibit A, p. 23:11-13; also, Exhibit 3.

26.     Danielle Palomares, who was hired for the School Library Assistant position at Curie, has an associate's degree. Ex. C, p. 85:16-22, p. 86:8-15 (hired), Ex. C, Dep. Ex. 3, at p. 4 (Palomares Candidate Materials, attached here as Exhibit H) (BOE 001235-001236).

**RESPONSE:** Admit.

27.     Palomares had experience working in a library and because Principal Tingwall had the opportunity to observe Palomares while she worked as a SECA at Curie, she had "direct and robust" knowledge of Palomares's "attributes of reliability" and other work characteristics that were important to Principal Tingwall's hiring decision. Ex. C, p. 86:3, 11-15.

**RESPONSE:** Disputed. Homero Penuelas, Assistant Principal of Literacy & Language at Curie, stated that Palomares "lack[ed] experience in a library setting". Exhibit 4, BOE 001252. Plaintiff disputes statement 27 as argumentative. Plaintiff does not dispute Tingwall's knowledge of Palomares working at Curie.

28.     Palomares's interview performance was "fantastic" and she had "tangible ideas that could be put into action." Ex. C, pp. 89:20-90:9.

**RESPONSE:** Admit that that is what Tingwall testified to about Palomares.

29. Principal Tingwall would have hired Palomares even if she did not speak Spanish. Ex. C, p. 91:5-6. While Principal Tingwall did not know how old Palomares was, she would have hired Palomares, if she did know her age, and she was over forty. Ex. C, p. 91:8-10.

**RESPONSE:** Plaintiff disputes statement 29 as argumentative, speculative and calls for a legal conclusion. Plaintiff further disputes because Tingwall testified: "So our hiring process, in my opinion, is that there's not like one distinct thing that makes it an automatic quality or that's more or less valuable than another. We need to assess like the full set of experiences and skills that a person is presenting to us to ultimately decide who is the best fit." Ex. C, p. 56:19-24.

30. A standard rubric was used to evaluate all candidates for the School Library Assistant Position, including Plaintiff and Palomares. Ex. C, p. 82:8-22. The rubric did not set forth race, national origin, or age as criteria. Ex. C, pp. 82:23-83:10; Ex. H, p. 1 (BOE 001232). The questions asked of the candidates during their interviews did not mention anything about a candidate's age, national origin, or race. Ex. C, p. 83:11-23, Ex. H, p. 2 (BOE 001233).

**RESPONSE:** Plaintiff disputes statement 30 as argumentative, speculative and calls for a legal conclusion. Plaintiff admits the facts testified to by Tingwall.

31. Plaintiff rated lower than at least two other candidates on the rubric. Ex. C, p. 79:1-7, Dep. Ex. 4, Plaintiff's Candidate Materials, attached here has Exhibit I, at p. 1 (BOE 001228); Ex. H, p. 1 (BOE 001232); Exhibit J, Balderas Candidate Materials, p. 1 (BOE 001242). Palomares was the highest rated candidate under the rubric. Ex. C, pp. 91:11-92:24; Ex. I, p. 1; Ex. J, p. 1 (BOE 001242); Ex. H, p. 1 (BOE 001232).

**RESPONSE:** Admit.

32. Plaintiff does not know why she was not hired for the Curie School Library Assistant Position. Ex. A, p. 224:2-5. She does not know Palomares' work history or qualifications or how

Palomares performed in her interview. Ex. A, pp. 127:10-128:22. She admits she has no reason to believe that Palomares was not qualified for the position. Ex. A, pp. 127:10-128:22. The only reason she believes Palomares was treated better than her is because she thinks she is Hispanic based on her last name. Ex. A, pp. 127:10-128:22.

**RESPONSE:** Admit.

*c. Stevenson – Special Education Classroom Assistant ("SECA").*

33.      A SECA "assists in the instruction of disabled students; and performs related duties as required," including lifting and positioning non-ambulatory students, providing one-on-one tutoring services, providing personal hygiene services such as toileting, assisting students with orthopedic impairments, accompanying students to swimming pools and medical clinics, taking notes in classrooms for students unable to do so themselves, and correcting homework assignments. SECA Job Description, attached here as Exhibit Z (BOE 000280-000281); *see also* Ex. D, p. 80:3-9.

**RESPONSE:** Admit.

34.      Plaintiff applied for SECA potion no. 581041 at Stevenson on February 6, 2018 and interviewed for that position sometime thereafter. Ex. A, p. 175:2-11, p. 177:13-16 (application and interview); p. 188:5-21; Stevenson Requisition attached as Exhibit T, (BOE 000472-000477). Plaintiff does not recall who interviewed her for the position. Ex. A, p. 176:8-14.

**RESPONSE:** Admit.

35.      Principal O'Toole, who made the hiring decision for the SECA position, is over 58 years old, Caucasian, and has been the Principal at Stevenson since February 6, 2016. Ex. D, pp. 11:24-12:3, p. 21:1-15, p. 105:5:23.

**RESPONSE:** Admit.

36.      In evaluating candidates for any position at Stevenson, Principal O'Toole considers that person's relevant experience. Ex. D, p. 53:9-24.

**RESPONSE:** Disputed. O'Toole testified, "I'll look through the resume and I'll look to see if they meet the qualifications and what kind of experience they have at performing whatever the position is that I have advertised so those are the kinds of things I look for." Ex. D, p. 52:2-7.

37. Recent SECA experience, especially within the last two to three years "weigh[ed] tremendously heavily" in the candidate's favor because the responsibilities of persons caring for special needs students at CPS has changed dramatically, and not being up-to-date on the new requirements could be detrimental to the classroom. Ex. D, pp. 101:8-103:5.

**RESPONSE:** Plaintiff disputes statement 37 as argumentative and mischaracterizes the testimony. O'Toole testified "if they're currently working as a SECA or they have, you know, recent experience within the last two or three years they should be up-to-date on the requirements of the position and require minimal training and be able to hit the ground running, it would be an asset to the teacher. If you were to put somebody in the classroom that doesn't have any experience and is unsure what to do as a SECA it actually is detrimental with the classroom because the teacher has to spend a lot of time training and teaching a person how to do their job that they should already know how to do when they walk in the room." Ex. D, p. 102: 7-19.

38. In addition to the requirements and qualifications in the SECA job description, Principal O'Toole looked for SECA candidates who have a lot of patience and an affinity or an aspiration to work with students with special needs because of specific challenges working with these students can present. Ex. D, pp. 61:9-63:10, Ex. Z (BOE 000280-000281). A candidate with prior health care experience was also a "big plus" for a SECA candidate because the position can involve reviewing medical records and potentially administering medications or using an EpiPen. Ex. D, pp. 99:15-100:5.

**RESPONSE:** Admit.

39.     Plaintiff has never been a SECA, and the most recent experience she testified to having with special needs students was approximately ten years prior to applying to be a SECA at Stevenson. Ex. A, p. 178:8-12. Following her layoff, Plaintiff really was not interested in SECA positions, and the resume forwarded to Principal O'Toole did not include any experience working with special needs students or indicate any interest in doing so. Ex. A, pp. 196:7-198:14, p. 280:13-16; Ex. R, p. 2 (BOE 001044).

**RESPONSE:** Disputed. Plaintiff applied for 10 SECA positions with the City of Chicago Public Schools after her layoff in 2017. Exhibit 5. Plaintiff had 9 years-experience as a special education aide, just not the title. Ex. A, p. 198:15-19. Furthermore, the citation provided by the Defendant is to a resume that was sent to Principal Magdaleno, not O'Toole. Ex. A, p. 196: 7-24.

40.     Daniela Nicolas showed a passion for working with special needs students through her experience, application materials, and in her interview. Ex. D, pp. 104:8-105:4. She was working at CPS as a SECA for more than five years when Principal O'Toole considered and then hired her for the Stevenson SECA position. Ex. D, pp. 104:8-105:4, Dep. Ex. 4, at BOE 001337-001338, Nicolas Resume, attached here as Exhibit U. She also had experience working in fields related to caring for others, particularly nursing. Ex. D, pp. 104:8-105:4; Ex. U. She had additional certifications beyond her SECA certification, such as Certified Nurse Assistant and Phlebotomy certifications. Ex. D, pp. 104:8-105:4; Ex. U. Nicolas had worked with the teacher in whose classroom she would be needed, and the two had worked exceptionally well together in the past, which was "a phenomenal opportunity that doesn't come your way very, very often." Ex. D, pp. 104:8-105:4, p. 71:1-12; Ex. U. She was a "phenomenal candidate." Ex. D, p. 70:21-23.

**RESPONSE:** Plaintiff disputes statement 40 as it is not a "short concise statement" in violation of Local Rule 56.1. Plaintiff admits the facts.

41.     Had Principal O'Toole seen Nicolas's resume prior to seeing Plaintiff's, he would not have considered Plaintiff because Nicolas's "resume is head and shoulders above [Plaintiff's] in terms of experience and commitment to working with children with special needs." Ex. D, p. 105:5-14.

**RESPONSE:** Admit.

42.     Principal O'Toole "absolutely" would have hired Nicolas even if she was over 40, if she was Caucasian, and if she didn't speak Spanish. Ex. D, p. 105:15-23. Nicolas is still a SECA at Stevenson and she has performed phenomenally in the position – Principal O'Toole would make the decision to hire her again. Ex. D, pp. 106:22-107:7.

**RESPONSE:** Plaintiff disputes statement 42 as it calls for speculation, is argumentative, and calls for a legal conclusion. Plaintiff admits only the facts as stated in the citations.

43.     Plaintiff does not know anything about Nicolas. Ex. A, p. 190:15-22. She does not know Nicolas's job qualifications, SECA experience, how she performed in her job interview, whether she worked at Stevenson prior to becoming a SECA there, her qualifications, certifications, or licenses, how old she is, where she is from, or whether she speaks another language. Ex. A, 190:20-192:10. And Plaintiff has no reason to think Nicolas is not qualified for the position and admits she does not know if she is more qualified than Nicolas. Ex. A, p. 191:18-20, p. 223.

**RESPONSE:** Plaintiff disputes statement 43 as it is argumentative, calls for a legal conclusion and is not a "short concise statement" in violation of Local Rule 56.1. Plaintiff admits that is what she testified to.

44.     Yolanda Tylon held the SECA position at issue before Nicolas was hired into it. Ex. A, p. 189:1-7, pp. 190:2-192:3, Dep. Ex. No. 24, Stevenson Position History, attached here as Exhibit V, (BOE 001332); Ex. D, pp. 68:12-70:3, p. 103:6-9. Tylon is over 40, African American, and does not speak Spanish. Ex. D, p. 103:10-20.

**RESPONSE:** Admit.

*d. Kelly – School Guidance Counselor Assistant*

45.     Kelly typically has over 100 applicants for positions such as the School Guidance Counselor Assistant. Ex. B, p. 83:13-21.

**RESPONSE**: Admit.

46.     With a starting salary of $34,000 for a step 1 employee, School Guidance Counselor Assistant positions are the lowest paid positions at Kelly other than Parent Worker. Ex. B, p. 103:4-7, p. 117:6-11.

**RESPONSE**: Admit.

47.     Principal Magdaleno opened the SGCA position because he had limited money available in the budget and it was a position the school could afford based on the salary lane dictated by the CBA. Ex. B, p. 99:7-14, p. 103:4-7, p. 117:6-11; Ex. N (CBA), at BOE 000816, 000824.

**RESPONSE**: Plaintiff disputes statement 47 as argumentative. Admit only that Magdaleno testified as such in his deposition.

48.     Under the CBA, the potential employee's step level correlates with their years of service and determines the salary that they must be paid for a specific position. Ex. B, p. 99:18-24, p. 102:14-18; Ex. N, at BOE 000825.

**RESPONSE**: Admit.

49.     The CBA, and not principals, dictates what, based on the steps and lanes, an employee's salary will be. Ex. B, p. 102:23-24, p. 103:16-24; Ex. N, at BOE 000825. The Board and principals cannot vary from these steps in paying employees. Ex. B, pp. 84:20-85:2, p. 103:22-24.

**RESPONSE**: Admit.

50.     Balcazar was new to the district with approximately one year of experience with CPS as a Parent Worker. Her salary in the SGCA position would have been approximately $34,000 pursuant to the CBA. Ex. A, p. 173:18-20; Ex. B, p. 104:7-13, p. 103:4-6; Ex. N, at BOE 000816, 000824.

Plaintiff does not know anything about Balcazar's experience before she started at CPS, her qualifications, or why she was hired. Ex. A, p. 221:16-22, p. 222:15-19, p. 224:6-9.

**RESPONSE**: Disputed. Balcazar was a SECA II when she was laid off in 2017 before being rehired, [Ex. B, p. 66:3-11; Ex. P] making more money than stated above [Ex. N]. Furthermore, Balcazar had been with the Chicago Public School system since 2012, more than one year. Exhibit 6, BOE 001396 (showing effective date of 11/08/2012). Plaintiff admits that she did not know about Balcazar's experience, qualifications or why she was hired.

51.     Plaintiff's starting compensation for the SCGA position would have been $52,394 – her pay step was 9. Ex. N, at BOE 000816, 000824; Exhibit W, Plaintiff's PeopleSoft - Step 9 (BOE 000309).

**RESPONSE**: Plaintiff disputes statement 51 as argumentative; but admits the facts.

52.     Principal Magdaleno hired Agnieszka Balcazar for as a School Guidance Counselor Assistant because Kelly "had just lost a significant amount of money, and based on the little amount of money that [Kelly] had and based on the needs of the school [he] hired somebody that [he] could afford." Ex. C, pp. 98:22-99:3.

**RESPONSE**: Plaintiff disputes Defendant's citation to Ex. C; it should be Ex. B, Magdaleno dep. Plaintiff further disputes Magdaleno's testimony because he really wanted to hire Balcazar back as a SECA. Exhibit 7, BOE 001170.

53.     Principal Magdaleno does not know how old Balcazar is. Ex. B, p. 67:11-13. Balcazar is Caucasian and speaks English and Polish. Ex. B, p. 67:16-19. She does not speak Spanish. Ex. B, p. 67:16-19.

**RESPONSE**: Admit; however, Defendant's People Soft system shows that she is 40 years old. Exhibit 6.

*e. Shields – School Clerk Assistant.*

54.     Principal Debra Fritz-Fanning has been the Principal at Shields since February 2016. Exhibit E, Deposition of Debra Fritz-Fanning, pp. 24:23-24:7. Principal Fritz-Fanning is 47 years old and Caucasian. Ex. E., p. 12:16-19. In addition to English, Principal Fritz-Fanning has very good Spanish comprehension and a pretty good ability to speak Spanish. Ex. E, pp. 12:20-13:2.

**RESPONSE**: Admit.

55.     Principal Fritz-Fanning was the person at Shields with final decision-making authority for the School Clerk Assistant position. Ex. E, p. 82:7-10.

**RESPONSE**: Admit.

56.     Principal Fritz-Fanning interviewed Plaintiff for the School Clerk Assistant position at Shields after receiving an email from Principal Magdaleno vouching for Plaintiff's awesomeness with her resume attached. Ex. E, pp. 83:6-84:10. When she received the email, she thought, "that's great. This is a candidate that we should consider for the position[]" because she "hold[s] [her] colleagues' recommendations in very high regard[.]" Ex. E, p. 84:8-14.

**RESPONSE**: Admit.

57.     Principal Fritz-Fanning hired Maribel Rodriguez for the School Clerk Assistant position at Shields. Ex. E, p. 66:6-11, p. 67:1-10.

**RESPONSE**: Admit.

58.     Principal Fritz-Fanning considers every employee at Shields to be instructional in some way, and everybody plays a role in supporting students to be successful at Shields. Ex. E, p. 56:19-23.

**RESPONSE**: Admit.

59.     Principal Fritz-Fanning was looking for a School Clerk Assistant who would put student achievement first because that is critical to what they do at Shields. Ex. E, pp. 68:24-69:3. So, she always asks candidates about what they believe their role is in student achievement. Ex. E, pp.

68:24-69:3, Dep. Ex. 2, at BOE 001387 – Principal Fritz-Fanning's Interview Questions, attached as Exhibit X.

**RESPONSE**: Admit.

60. Principal Fritz-Fanning asked several questions of all the candidates interviewed. Ex. X (BOE 001387). The first interview questions were, "what are your beliefs about student achievement? What is your role in living those beliefs?" Ex. X. (BOE 001387).

**RESPONSE**: Admit.

61. In Principal Fritz-Fanning's opinion, Plaintiff's response to the first question about student achievement was centered around herself and not around the students. Ex. E, p. 79:12-20.

**RESPONSE**: Admit.

62. According to Principal Fritz-Fanning, Rodriguez's response to that question was focused on students doing well academically, stating she would boost their learning and push them to get to the next level. Ex. E, pp. 79:21-80:6; Ex. X. (BOE 001387). She believed this answer, compared with Plaintiff's, is more centered on student achievement, which is "what [Principal Fritz-Fanning was] looking for from everybody that works on [Shields's] staff so that they have this understanding that [they] are all there, No. 1 for [the] students." Ex. E, pp. 79:12-80:6, p. 81:4-9.

**RESPONSE**: Plaintiff disputes statement 62 as argumentative; but admits the facts.

63. Principal Fritz-Fanning believed Rodriguez was confident in her answers, focused on the students, showed that she was motivated, a leader, and organized with specific examples. Ex. E, pp. 81:15-82:2. Rodriguez's performance in her interview was a factor in Principal Fritz-Fanning's decision to hire her. Ex. E, p. 82:3-6.

**RESPONSE**: Admit.

64. Plaintiff admits she does not have any reason to believe Rodriguez was not qualified for the position, and she doesn't know anything about her qualifications, work experience, or how she performed in her interview. Ex. A, p. 161-162, 166, 221-224.

**RESPONSE**: Admit.

65. Principal Fritz-Fanning would have hired Rodriguez even if she did not speak Spanish and was over 40. Ex. E, p. 82:14-20.

**RESPONSE**: Plaintiff disputes statement 65 as argumentative, speculative and calls for a legal conclusion; but admits that is what Fritz-Fanning testified.

66. Principal Fritz-Fanning does not know Plaintiff's age or whether she speaks any languages other than English. Ex. E. p. 69:4-10, p. 65:15-21. Even if Plaintiff did speak Spanish, principal Fritz-Fanning would not have hired her. Ex. E, p. 82:21-23.

**RESPONSE**: Plaintiff disputes statement 66 as argumentative, speculative and calls for a legal conclusion; but admits that is what Fritz-Fanning testified.

*f. Kennedy – School Clerk Assistant.*

67. Plaintiff interviewed for the School Clerk Assistant position with Kennedy's Resident Principal at the time, Brian Kelly. Exhibit F, Affidavit of Brian Kelly, ¶ 4.

**RESPONSE**: Admit.

68. Brian Kelly was the Resident Principal at Kennedy from January 1, 2017 to February 2018, the Assistant Principal at Kelly until the end of June 2019, and he has been the Principal at Dr. Martin Luther King Jr. College Preparatory High School since July 1, 2019. Ex. F, ¶ 2. He is African American, a United States citizen, and was born in 1972. Ex. F, ¶ 15.

**RESPONSE:** Admit.

69.     George Szkapiak has been the Principal of Kennedy since July 1, 2008. Exhibit G, Affidavit of George Szkapiak, ¶ 2. Principal Szkapiak was born in 1969, is Caucasian, and is a United States citizen. Ex. G, ¶ 7; Ex. A, p. 137:11-13.

**RESPONSE:** Admit.

70.     At Principal Szkapiak's request, Resident Principal Kelly reviewed applicants, conducted interviews, and made hiring recommendations for the School Clerk Assistant position in 2018. Ex. F, ¶ 4; Ex. G, ¶ 3.

**RESPONSE:** Admit.

71.     After the interviews, Resident Principal Kelly recommended that Principal Szkapiak hire Marie Gutierrez, who was born in 1965, for the School Clerk Assistant position at Kennedy because she was "hands down" the best qualified applicant for many reasons. Ex. F, ¶¶ 4, 10; Ex. G, ¶ 4; Gutierrez PeopleSoft, attached here as Exhibit AA (BOE 000353). For example, Gutierrez had all the necessary skills for the position, including nine years of experience as a School Clerk, glowing letters of recommendations from her time as a School Clerk, and about 13 years of experience as an operations supervisor at a bank. Ex. F, ¶ 6; Gutierrez Resume and Letters of Recommendation, attached as Exhibit BB.

**RESPONSE**: Plaintiff disputes statement 71 as argumentative, speculative and is not a "short concise statement" in violation of Local Rule 56.1. Plaintiff admits that the exhibits contain this information.

72.     Gutierrez also had an associate's degree in Business Administration. Ex. F, ¶ 7; Ex. BB, p. 2. While this was not a requirement for the position, Resident Principal Kelly considered it an asset. Ex. F, ¶ 7.

**RESPONSE:** Admit.

73.     More important to Resident Principal Kelly than her experience, was that Gutierrez had an understanding and devotion to what the Kennedy community needs were. Ex. F, ¶ 8. For

example, she was great with Students in Temporary Living Situations, which is a population of students at Kennedy. Ex. F, ¶ 8.

**RESPONSE**: Plaintiff disputes statement 73 as argumentative and speculative but admits that exhibit F contains this information.

74.     Resident Principal Kelly believed Gutierrez had a good overall disposition and "knocked her interview out of the park." Ex. F, ¶ 9. Everything about her made her the best candidate for the job. Ex. F, ¶ 10. Plaintiff does not know anything about Gutierrez's performance in her interview or her job qualifications and admits she has no reason to believe Gutierrez was not qualified. Ex. A, p. 144, p. 221:16-22, p. 224:6-9.

**RESPONSE**: Plaintiff disputes statement 74 as argumentative and speculative but admits that the exhibits contain this information.

75.     Resident Principal Kelly would have recommended Gutierrez to Principal Szkapiak even if she did not speak Spanish. Ex. F, ¶ 11. He did not know the candidates' ages or national origins. Ex. F, ¶ 12. In evaluating candidates for the position, including Plaintiff and Gutierrez, he did not consider their age, race, or national origin. Ex. F, ¶ 13.

**RESPONSE**: Plaintiff disputes statement 75 as argumentative, speculative and calling for a legal conclusion but admits that exhibit F contains this information.

76.     Based on his recommendation, Principal Szkapiak made the decision to hire Gutierrez for the School Clerk Assistant position at Kennedy. Ex. F, ¶ 14; Ex. G, ¶ 6. Among other things, Principal Szkapiak recalls that Resident Principal Kelly told him that Gutierrez was "great, great, great, that she made you feel at ease as soon as you started talking to her, her good spirit and the way she interacted with people lightens up your day, she was an excellent communicator, she had good prior experience that was directly relevant to the position, and he received glowing feed-back when he checked her references." Ex. G, ¶ 5.

**RESPONSE**: Plaintiff disputes statement 76 as hearsay. Without waiving the objection, Plaintiff admits that is the content in exhibit G.

77.     Principal Szkapiak did not consider age, race, or national origin when he decided to hire Gutierrez for the School Clerk Assistant position. Ex. G, ¶ 10.

**RESPONSE**: Plaintiff disputes statement 77 as argumentative, speculative and calling for a legal conclusion but admits that exhibit G contains this information

78.     After being hired, Gutierrez performed well in the position and was a remarkable asset to Kennedy. Ex. F, ¶ 16; Ex. G, ¶ 5. For example, she goes above and beyond with everything they ask her to do, she is doing a great job with our Students in Temporary Living Situations, she takes genuine care of the students and checks in with them on a regular basis, and whenever Principal Szkapiak goes to the attendance office, it is clear that she has created such a respectful and supportive environment for all of the parents who visit Kennedy and for the students who need assistance. Ex. G, ¶ 5.

**RESPONSE:** Admit.

79.     Rachel Peralta has been the Assistant Principal at Kennedy since 2015. Ex. G, ¶ 9. She is from the Philippines and is not of Hispanic descent. Ex. G, ¶ 9. She speaks Spanish. Ex. G, ¶ 9.

**RESPONSE:** Admit.

   *g. Miscellaneous positions.*

80.     Plaintiff also claims she applied for approximately 19 other positions. ECF No. 10, ¶¶ 23, 24. Plaintiff does not know anything about the qualifications of any of the individuals who were hired for these positions and does not know why she was not interviewed for these positions. Ex. A, p. 204:5-9, p. 221:16-22, p. 224:6-9.

**RESPONSE:** Admit; although Plaintiff disputes "claims she applied" when the Defendant is the employer for other positions applied for. Exhibit 5.

**PLAINTIFF'S ADDITIONAL STATEMENTS OF FACT**
**PURSUANT TO LOCAL RULE 56.1(b)(3)(C)**

81. The Chicago Board of Education is required by the Illinois School Code to adopt an annual school budget for each fiscal year no later than 60 days after the beginning of the fiscal year. The Board's fiscal year starts July 1 and ends the following June 30. Exhibit 8, Appendix C, Chicago Public School Budget Process.

82. The CBA provides that a laid-off employee with an ESP classification can be recalled during the two years following the layoff.

> [i]f a school or unit opens a bargaining unit position in the same job title from which one or more ESP employees at that school or unit was laid off within two (2) years of the effective date of the affected laid off bargaining unit ESP employee(s)' layoff(s), the CEO or designee shall offer to re-staff laid off bargaining unit ESP employees to the position in order of seniority . . . The CEO or designee shall make the offer to re-staff to an eligible laid off bargaining unit ESP irrespective of whether or not a laid off bargaining unit ESP has accepted an interim assignment . . . or a permanent appointment in another position or at another school.

Exhibit N, p. 397, BOE000921.

83. Kelly High School's budget for School Year 2018-2019 or Fiscal Year 2019 had approved two School Clerk Assistant Positions. Exhibit 2, Thomas Kelly High School Budget All Job Summary. Principal Magdaleno did not open the second position. Ex. B, p. 44:10-16, p. 93:13-24; p. 94:1-4.

84. Around October 4, 2017, there were discussions at Kelly about hiring another SECA and Balcazar interest in returning to work at Kelly, after being laid off. Exhibit 7, Magdaleno October 4, 2017 email; Exhibit P.

85. Beth Hickey informed Principal Magdaleno that she was interested in and applied for the Guidance Counselor Assistant position that he opened at Kelly in October 2017. Exhibit 9, Magdaleno October 13, 2017 email.

86. In addition to the positions set forth in SOF ¶6, Beth Hickey had also applied for the

following positions within the Board of Education for the City of Chicago but failed to secure even an interview: To Launch Onboarding (Clark St. Office); Guidance Counsel Assistant (Mayer School, Hernandez Middle School, Bogan High School, and Christopher School); FY 17/18 Guidance Counselor Assistant (Richardson Middle School); Special Education Classroom Assistant (Kennedy High School x3, Byrne Elementary, Curie High School, and Solorio Academy); Special Education Classroom Assistant I (Kennedy High School); Special Education Classroom Assistant II (Brighton Park Elementary and Dore Elementary); School Clerk Assistant (Ogden School, Disney II Magnet School, and Armour Elementary); PT Seasonal Position (Kinzie School) and Miscellaneous School Support (Pasteur School). Exhibit 5.

87. Beth Hickey also searched for employment at Suburban Cook County School Districts. Exhibit 10.

88. In 1993, Beth Hickey was a school clerk at Orozco Elementary school, a Chicago Public School. Ex. A, p. 28: 5-7. Ms. Hickey resigned from Orozco because of racial harassment by the principal. Ex. A, p. 35: 12-23; Ex. 11.

89. Beth Hickey then transferred to St. Daniel the Prophet as a school clerk until 1998. Ex. A, p. 28: 12-22. Thereafter she became a School Clerk Assistant at John C. Dore Elementary, a Chicago Public School, from 1998 until 2007 and then was promoted to School Clerk I, from 2007 until 2013. Ex. A, p. 28:23-29:15. In July 2013, Ms. Hickey was laid off by CPS allegedly for budgetary reasons. Ex. A, p. 32:4-24; also Ex. A Ex. 3.

90. Ms. Hickey secured a School Clerk Assistant position at Kelly High School in 2014, where she was employed until being subsequently laid off, for a second time, on August 22, 2017. Ex. A, p. 43:22-44:2; Ex. I (BOE 001231); Ex. L.

91. At Kelly, Ms. Hickey was assigned to not only perform the functions of a school clerk

assistant but was also performing registrar functions. Ex. A, p. 45:16-48:7. Upon her termination, the administrative registrar functions were transferred to a bi-lingual teacher, Ms. Cosme. Ex. A, p. 209:4-13. Although Principal Magdaleno claims that the registrar duties were performed by Magda Sokolowska, Ex. B, p. 38:8-24, she too was a teacher (Exhibit 12).

92. In 2017, "CPS asked their ODLSS reps and their network people to come in and went school by school and said that they were going to –told schools how many positions they were allowed to have." Ex. 13, Chicago Public Schools Public Budget Hearing, August 23, 2017, at 3:30 pm, p. 20:19-23.

93. Magdaleno selected 31 positions for layoff (PSOF 12), even though the budget reduced the number of positions by only 25.5 Ex. 14, Kelly High School Budget School List.

94. Ms. Williams-Hayes, a 24-year CPS paraprofessional testified that employees with good evaluations were being terminated. "And unfortunately, many of them have lots of years of service, I know you guys are going after people that have veteran years, you want to get rid of them because that cuts your budget, but it leaves these families without an income." Ex. 13, Budget Hearing, p. 43: 6-21.

95. Ms. Hickey had received outstanding job reviews during her CPS employment. Ex. 15.

96. The longer an employee works for a district the higher step level they obtain and the more money they make. Ex. B, p. 112:2-21. Employees age as they gain years of service. Ex. B, p.112:22-113:1.

97. Magdaleno did not consider reducing the number of Assistant Principals that were at Kelly High School. "I wanted to ensure that my teachers were getting the support that they needed and the coaching that they needed and the coaching that they asked for in order for them to become better instructors, therefore having a greater impact on the educational needs of our students. In addition to that, we had to pick up some of the work that was left behind based on the budget cuts.

So people just picked up additional responsibility. But the primary goal was for us to support our students by supporting and mentoring 130-something, 140-something teachers." Ex. B, p. 108:23-109:13. The cost for the 4 Assistant Principals was $427,664 (so approximately $106,916 each), while a School Clerk Assistant was only $44,744. Ex. 2, Kelly Job Summary FY2018.

98.   Magdaleno after closing all of the lowest position, parent-worker, to balance the budget, he then opened miscellaneous positions to try to help those laid off employees out. Ex. B, p. 117:6-20.

99.   Magdaleno testified that he opened a position at Kelly based upon what he could afford in the budget. Ex. B, p. 98:23-99:14. He had to pick an individual that would have a lower step because step is based upon years of experience; the more years of service the more the employee costs. Ex. B, p. 99:18-103:24. He chose Ms. Balczar, and not Ms. Hickey, because she was newer to the district and her salary would be less. Ex. B, p. 104:1-13.

100.   Ms. Hickey was not even allowed an interview for the position, despite applying for it. Ex. A, p. 210:1-12.

101.   Each of the CPS administrators that called Ms. Hickey in for an interview asked her whether she spoke Spanish. Ex. A, p. 99.

102.   Bilingual are preferred per se because that is the population we need to serve. Ex. B, p. 60:3-7.

103.   The Board of Education for the City of Chicago is responsible for the governance and oversight of Chicago Public Schools. Exhibit 16, Mission Statement-Office of the Board of Education. It is tasked with "establishing policies, standards, goals and initiatives to ensure accountability and provide a world-class education that prepares our students for success in college and career." Id.

104.   In the CBA, Section 2-1, "No employee shall be discriminated or retaliated against

on the basis of race, creed, color, age, sex, national origin, marital status, disability or sexual orientation; the utilization of benefits authorized by this Agreement or BOARD policy; . . ." The Board also implemented and promotes a Recruiting Plan that emphasizes "racially diverse pool of candidates to fill positions" and training of "principals and head administrators regarding the implementation of the BOARD's plan". CBA Section 2-2; Exhibit N.

105.    The attributes that Tingwall used in hiring the Library Assistant fall outside the parameters set by the Chicago Board of Education. Exhibit 17, BOE 001269-001272.

106.    Principal Tingwall considered Hickey for the position of Library Assistant and had her interviewed because she "had characteristics in line for what we were hoping to find for the Library Assistant position". Ex. C, p. 46: 10-23.

107.    Neither the Chicago Board of Education nor the HR department assist in going through resumes and criteria for applicants for Chicago Public School positions and instead leave it to the principals to do themselves. Ex. C, p. 52:15-19.

108.    Fritz-Fanning knew Rodriguez prior to hiring. Exhibit E, p. 66:3-5.

109.    In Illinois, the Chicago Public Schools have a mandate that any school enrolling more than 20 EL students who speak the same language must offer a bilingual education program, which places extra pressure on local schools to hire and retain bilingual educators. Exhibit 18, p. 38.

Dated: September 30, 2020            Respectfully submitted,

**PLAINTIFF BETH ANN HICKEY**

By:    _s/ Anthony J. Peraica_
       Anthony J. Peraica, ARDC #6186661

Anthony J. Peraica & Associates, Ltd.
5130 S. Archer Avenue
Chicago, Illinois 60632
(773) 735-1700; support@peraica.com

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony J. Peraica, an attorney of record, do hereby certify that on September 30, 2020, I electronically filed the above **Plaintiff's Response to Defendant's Statement of Facts and Plaintiff's Additional Facts** using the Court's CM/ECF Filing System, which will send electronic notice to all counsel of record, including:

Lindsey E. Goldberg    legoldberg@cps.edu
Angela R. Huisingh     arhuisingh@cps.edu
Board of Education of the City of Chicago
One North Dearborn Street
Law Department, Suite 900
Chicago, Illinois 60602


By:    /s/ Anthony J. Peraica
        Anthony J. Peraica